Ms. Nicole Cemelli
782 5th Street
Secaucus,  NJ 07094
Defendant, Pro Se
(201) 240-9360

U.S. BANKRUPTCY COURT
FILED
NEWARK, NJ

2019 OCT -2 P 3: 37

JEANNE A. HAUGHTON

BY:_____
DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY --- NEWARK
------------------------------X
In Re:                              Case No: 19-25881
      Nicole Cemelli

                                    CHAPTER 7


------------------------------X
Christopher Ellis Bouzy

        PLAINTIFF
                                ADV. PRO. NO. 19-2151

      -against-                 **Hon. Vincent  F.  Papalia
                                   U.S.B.J.**

Nicole Cemelli


        DEFENDANT
------------------------------X

                    **ANSWER TO COMPLAINT ALLEGING
                         STAY VIOLATION**


      Defendant, Nicole Cemelli, acting pro se, Answers the above

Complaint which initiated the above entitled Adversary Proceeding,

as follows:

                    ### First Count

                      Introduction

      1.  Deny.

                      Complaint

      2.  Deny.  Plaintiff has cut and pasted and distorted the text

message exchange.   The defendant only requested payment of post-petition rent.

3.   Deny.

4.   Admit.

5.   Admit.

6.   Admit.

7.   Admit that venue is correct, but deny the alleged stay violation.

8.   Admits that this is a core proceeding.

### Factual Allegations

9.   Deny.

10.   Admit to knowing about the stay.   Deny violating the stay.

11.   Deny.

12.   Deny.

13.   Deny.

14.   Deny.

### Cause of Action

15.   Defendant restates the answers as set forth above as if they were fully set forth herein.

16.   Deny.

17.   Deny.

18.   Deny any damages.

19.   Deny.

### Affirmative Defenses

#### First Affirmative Defense

1. The plaintiff has misrepresented the text message exchange between the parties.

2. Attached as an exhibit is the full text message exchange.

3. As can be seen from the actual text message exchange, the defendant **only** was asking for payment of post-petition rent -- rent due **after** the plaintiff had file for Chapter 7 bankruptcy protection not for pre-petition rent.   So there was no stay violation.

#### Second Affirmative Defense

1. Even assuming there was a stay violation there were no damages.

2. The plaintiff is pro se so the plaintiff incurred no legal fees.

3. According to the docket report on this case, it appears that the plaintiff didn't even pay the court filing fee.

4. The plaintiff tricked the defendant into potentially violating the stay by his conduct and he should not be rewarded for his conduct.

5. The facts in the within case are very similar to those in the case In re Baez, 493 B.R. 228 (Bankr. D. Colo 2013) wherein, as in this case, the plaintiff's own conduct bears a significant

portion of the responsibility for creating the stay violation.

WHEREFORE, the defendant prays that the plaintiff's request for a finding of a stay violation be denied and alteratively, if a stay violation is found that no damages be awarded.

Dated:  October 2, 2019

Ms. Nicole Cemelli
Defendant pro se

Exhibit A -- Copy of Complete Text Message Exchange

9:29

*Post Petition Rent !!* (handwritten)

**Why did you not pay September rent? Pay your rent Christopher.**

Moving forward please address me as Mr. Bouzy and I will address you as Ms. Cemelli, thank you. Also, I would suggest you speak with your bankruptcy attorney because you just violated the stay restraining you from attempting to collect debt/payment(s). Actually, your landlord/tenant attorney violated the stay when he attempted to get me to agree to a deal after I notified you and him about the bankruptcy.

**Your bankruptcy filing doesn't mean you don't have to pay future rent, Chris.**

**Pay your rent.**

  

      



Christopher

If you're broke, move into a
lower rent apartment
somewhere else. Try to get
help from the government for
rent support. Do something.
Don't just squat in my house
and live off me. It's not right.
I'm basically supporting your
family. Does that make you feel
like a man? Me paying for you
to live?

Ms. Cemelli, please stop. You
rented us an apartment without
disclosing the flood zone, and
you didn't disclose there were
no communication cables
coming into the building. At
that time I asked you for a
REASONABLE discount to
compensate me for having to
rent computing power while
there was no internet, and you
said no. We had no choice but
to withhold rent, and you took
us to court. When things
started getting out of hand, I
attempted on several










Christopher

said no. We had no choice but
to withhold rent, and you took
us to court. When things
started getting out of hand, I
attempted on several
occasions to settle with you,
and made you a several fair
offers before filing Chapter 7,
and you didn't accept.

It was you who threatened a
lean of over 11k, instead of just
countering with something
reasonable. 9000+ wasn't
reasonable.

Why did you wait until AFTER I
filed Chapter 7 to offer me a
deal, when you could've made
the same deal days before?

You literally spent thousands
on attorney fees, when you
could've given us a reasonable
discount each month while we
waited for Verizon and this
would've never gotten out of











9:30

You literally spent thousands on attorney fees, when you could've given us a reasonable discount each month while we waited for Verizon and this would've never gotten out of hand. A phone call, an apology, and a few hundred dollars off of rent is all we ever wanted.

Yeah ok. Maybe you need to reread your emails of what I was offering my tenants for their patience (which you clearly had no patience at all). Withholding rent to punish me for your dissatisfaction with the internet that was offered at the time is wrong. You're wrong. You could not be more wrong. You would have moved out if these were real concerns for you. You did not. Only reasonable conclusion is that you're trying to take advantage of me and live for free. Sad. Very sad that people of that nature exist. Be an adult, pay













Christopher

Moreover, be on time for
your rent and stop wasting my
time having to constantly ask
for it.

Jesus Christ...

I swear in my 44 years I have
never met someone so difficult,
never.

1. I was solving the issue by
renting computing power.
There was no reason to move,
just wait until Verizon finished
the work.

2. We withheld rent because of
#1.

3. We stopped paying rent
completely AFTER you took us
to court.

4. Do you think I would make
you an offer and not be
serious?

  

      



Better yet...

You're continuing to live there.
Why do you feel like you don't
have to pay to live there?
Where's the logic?

Pay your rent.

You have insulted me
numerous times, made all
types of wild accusations...etc.
Have I once ever lied to you or
misled you?

You are continuing to occupy
my home. Pay for the use and
occupancy of that space.

Can you answer the above
question?

I'll save you the trouble... the
answer is NO. Not once have I
ever lied or misled you. When I
said I would fo something, I did
it.

  

      



Christopher

You're entire persona is a lie. Your application to get into that apartment was based on you lying about who landlord was. You provided Luce the realtor with a number to someone that was NOT your landlord and had that person lie on your behalf about being a good tenant and always paying your rent. Now that is fraud.

You lied when you said you would move out.

You lied when you said you would pay June rent in full, after you only paid half in May.

You're constantly lying to try to continue to live in a beautiful home that you cannot afford and never planned on paying for.

I'm actually embarrassed for you.











Christopher

Pay your rent. Sept rent is past
due. Pay it immediately.

1. My entire persona isn't a lie,
but if you say so.

2. I have text messages from
Luce coaching us.

3. We said we would pay June
IF you agreed on my terms, you
said NO.

4. We said we would move if
you agreed to allow us to break
the lease, you said NO.

5. I am constantly lying? Now
you are projecting. What ever
happened to the deal with
church street and the
temporary line?

Pay your rent.

Stop being pathetic.

  

      

Does calling me names make you feel better?

Does insulting me you feel better?

The only thing I feel is sorry for you. Pay your rent. It's the right thing to do.

According to you I can't pay rent, so why are we having this discussion? Apparently I am a pathetic squatter who is living off of you.

Ms. Cemelli I won't get in the gutter with you; it's pointless.

Never said you can't, just that you're choosing not two. Sentence two - Correct!

Actually you implied I can't...

Ms. Cemelli... I looked you in your eyes and told you if you














Christopher

Ms. Cemelli... I looked you in your eyes and told you if you went to court it wouldn't go your way. I also told you a few weeks ago if we didn't settle it would cost you more. YOU made this a legal matter when it could've been resolved. Take some freaking responsibility for your actions.

Insulting me and repeatedly saying "pay your rent" isn't resolving this matter.

Pay your rent.

This conversation is over.

I sincerely don't know why you sent me a text message, and I don't know why I bothered to respond. Every exchange with you is the same. I have yet to have one reasonable conversation with you.

BTW... There are strick laws in

                

Insulting me and repeatedly
saying "pay your rent" isn't
resolving this matter.

Pay your rent.

This conversation is over.

I sincerely don't know why you
sent me a text message, and I
don't know why I bothered to
respond. Every exchange with
you is the same. I have yet to
have one reasonable
conversation with you.

BTW... There are strick laws in
NJ regarding how you handle
security deposits and what you
can and can't do with the
money. So don't throw words
around like fraud when you are
living in a glass house. I do my
homework Ms. Cemelli. Good
night.











Christopher

> Christopher, are you planning on paying your rent this month? Internet is now available.

1. Nicole, there is no internet and I am not sure why you are claiming there is. Yes the Verizon contractor ran the PVC tubing from the pole to the building, but Verizon hasn't run the fiber to the building yet. I spoke to Tim the inspector from Verizon, and it could be days or weeks before there is internet. There are 2 more steps remaining.

2. We are now in the middle of a legal dispute and it's best we communicate through our attorneys because this here is not working. You said you were open to a solution, I asked you what your solution was, and you never responded. What is











2. We are now in the middle of
a legal dispute and it's best we
communicate through our
attorneys because this here is
not working. You said you were
open to a solution, I asked you
what your solution was, and
you never responded. What is
your solution Nicole?

> Incorrect. Verizon needs an
> order to be placed by a tenant
> to run the wire. The connection
> is available.

Who told you that? Fiber has to
run from the pole to the
building, and then to the box
that was installed by the other
contractors. A normal tech
can't do that. The building
would be certified and then we
could then place an order. We
couldn't place an order now if
we tried. If I am wrong, I'll be
the first to say I am wrong.



      

9:29

Your solution continues to be
that you don't have to pay your
rent, which is unacceptable.

As for the current and future,
you are still occupying my
apartment. Therefore you must
pay for such occupancy.

I don't understand how you
think it's acceptable to live in
my home and not pay rent.
Mind blowing actually.

You are incorrect. Verizon is
now available for setup.
Please pay your July rent.
Have a nice day.

No it's not, so either someone
gave you bad information or
you are confused. I literally
spoke to the man responsible
for signing off on the work
done the day of the work, and
asked him.














Christopher

Verizon is now available. The choice is yours whether you would like to create your own account for service. Just simply an option I have now made available to my tenants.

No Nicole, it's mind blowing you refuse to take responsibility for your actions. YOU rented us an apartment without disclosing the flood zone, YOU rented us an apartment without cable/internet that was advertised as cable ready, but you expect rent. I asked you what is YOUR solution and you keep citing my solution. Your ONLY solution is "pay me and deal with it." Now you are trying to gaslight me by claiming Verizon is available when it's not. I am vaccinated against gaslighting. I am done having these pointless text exchanges with you. Please don't text me again, we will communicate through our











Exhibit B -- Copy Baez Case

Lexis Advance®
Research

Document: In re Baetz, 493 B.R. 228

# In re Baetz, 493 B.R. 228

## Copy Citation

United States **Bankruptcy** Court for the District of Colorado

February 21, 2013, Decided

**Bankruptcy** Case No. 12-10519 EEB, **Chapter 7**

Reporter
493 B.R. 228 * | 2013 Bankr. LEXIS 2662 ** | 2013 WL 3326658

**In** re: BRIAN KEITH BAETZ, JENNIFER REBECCA BAETZ, **Debtors.**

## Core Terms

**landlord, rent,** automatic stay, pre-petition, eviction, post-petition, Notice, **property** of the estate, violations, **deposit,** lease, apartment, equitable, residential lease, willful, **bankruptcy filing,** abandonment, proceedings, provisions, exemption, schedules, personal **property,** principles, terminated, automatically, obligations, consulted, setoff

## Case Summary

### Procedural Posture

**Chapter 7 debtors** requested that sanctions be imposed under 11 U.S.C.S. § 362(k) against their former **landlord** and its **property** manager for violations of the automatic stay.

### Overview

The **debtors** complained of numerous actions taken by the **landlord** following their **bankruptcy filing.** The court held that the **landlord**'s attempt to collect **rent** did not violate the stay because it attempted only to collect post-petition **rent.** The act to evict the **debtors** from the apartment, however, may have constituted a technical violation of the stay because it was not clear that the deemed rejection of the lease by the trustee constituted an abandonment. The attempt to offset the **debtors'** **deposit** against their outstanding pre- and post-petition **rent** obligations was a violation of the stay. However, any technical violations committed by the

landlord and its agents were in large part caused by the **debtors'** statements and actions lulling them into a

false sense of **security**. As a result, equitable principles relieved the court from what was otherwise a

mandatory obligation to impose sanctions for stay violations.

### Outcome

The court denied the **debtors'** request for the imposition of sanctions.

▼  LexisNexis® Headnotes

Bankruptcy Law > ... > Automatic Stay ▼ > Scope of Stay ▼ > General Overview ▼

*HN1* **Automatic Stay, Scope of Stay**
The automatic stay is one of the fundamental **debtor** protections provided by the **bankruptcy** laws. It gives
the **debtor** a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure
actions. It permits the **debtor** to attempt a repayment or reorganization plan, or simply to be relieved of the
financial pressures that drove him into **bankruptcy**. ⚲ More like this Headnote

*Shepardize* - Narrow by this Headnote

Bankruptcy Law > ... > Automatic Stay ▼ > Scope of Stay ▼ > General Overview ▼

*HN2* **Automatic Stay, Scope of Stay**
Among other things, the stay prevents a creditor from taking any action to collect a prepetition debt or to
enforce its lien rights, including the following provisions of 11 U.S.C.S. § 362: (1) the commencement or
continuation, of a judicial, administrative, or other action or proceeding against the **debtor** to recover a claim
against the **debtor**; (3) any act to obtain possession of **property** of the estate or of **property** from the estate
or to exercise control over **property** of the estate.(6) any act to collect, assess, or recover a claim against the
**debtor** that arose before the commencement of the case; (7) the setoff of any debt owing to the **debtor** that
arose before the commencement of the case under this title against any claim against the **debtor**. 11 U.S.C.S.
§ 362(a). ⚲ More like this Headnote

*Shepardize* - Narrow by this Headnote

Bankruptcy Law > ... > Administrative Powers ▼ > Automatic Stay ▼ > Duration of Stay ▼

Bankruptcy Law > ... > Automatic Stay ▼ > Scope of Stay ▼ > General Overview ▼

Bankruptcy Law > ... >     Discharge & Dischargeability ▼ > Effect of Discharge ▼ >

Protection of Debtors ▼

*HN3* **Automatic Stay, Duration of Stay**
Once a **debtor** informs his creditors of his **bankruptcy filing**, he is not required to do anything else. The
automatic stay operates as its name states-- "automatically." This breathing spell, however, is only a temporary
measure. Just as it springs into being automatically, it also terminates automatically following certain events.
Those provisions of 11 U.S.C.S. § 362(a) that protect **property** of the estate lapse once the **property** is no
longer **property** of the estate. 11 U.S.C.S. § 362(c)(1). All other provisions remain in effect only until the
earlier of dismissal, case closing, or the entry of a discharge order in the case of an individual **chapter** 7
**debtor** (and certain other **debtors**). 11 U.S.C.S. § 362(c)(2). At the conclusion of the typical **chapter** 7 case,
the automatic stay is replaced by the discharge injunction set forth in 11 U.S.C.S. § 524. The discharge
injunction eliminates the **debtor's** personal liability for the pre-petition debt owed to the creditor (unless it is a
non-dischargeable debt), but it does not eliminate any lien rights that may exist. ⚲ More like this Headnote

*Shepardize - Narrow by this Headnote*

Bankruptcy Law > ... > Automatic Stay ▼ > Violations of Stay ▼ > Damages ▼

**HN4** ⬇ **Violations of Stay, Damages**
In order to impose sanctions against a creditor for violating the stay, the court must first find the creditor's actions were "willful." 11 U.S.C.S. § 362(k). In order for a violation to be "willful," evidence of specific intent to violate the stay is not required. Violations are "willful" if the party knew of the automatic stay and intended to take the actions that violated the stay. A party's good faith belief that it has a right to the **property** at issue is not relevant to a determination of whether the act was "willful" or whether compensation must be awarded. Even an innocent stay violation (one committed without knowledge of the stay) becomes willful, if the creditor fails to remedy the violation after receiving notice of the stay. **In** effect, the term "willful" refers to the deliberateness of the conduct, coupled with knowledge of the **filing**. It does not require an intent to violate a court order. Once a court finds a violation of the stay to be willful, 11 U.S.C.S. § 362(k) ordinarily makes the award of damages for injuries mandatory. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Bankruptcy Law > ... > Automatic Stay ▼ > Scope of Stay ▼ > Claims Against **Debtors** ▼

Bankruptcy Law > ... > Claims Against **Debtors** ▼ > Judgments & Rulings ▼ > Enforcements ▼

**HN5** ⬇ **Scope of Stay, Claims Against Debtors**
The automatic stay prevents creditors from acting to collect a debt or to commence or continue legal proceedings. 11 U.S.C.S. § 362(a)(1), (6). The language of 11 U.S.C.S. § 362(a), however, prohibits only proceedings and collection activity that attempts to collect a pre-petition debt. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Bankruptcy Law > Administrative Powers ▼ > Executory Contracts & Unexpired Leases ▼ > Rejections ▼

**HN6** ⬇ **Executory Contracts & Unexpired Leases, Rejections**
In virtually every **Chapter 7** no-asset case the trustee realizes no benefit from assuming the **debtor's** residential lease, and thus in virtually every **Chapter 7** no-asset case, the residential lease is deemed rejected. "Rejection," however, is not synonymous with termination of the lease. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Governments > Legislation ▼ > Interpretation ▼

**HN7** ⬇ **Legislation, Interpretation**
The rule of statutory construction known as expressio unius est exclusio alterius, provides that when the persons and things to which a statute refers are designated, there is an inference that all omissions should be understood as exclusions. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Bankruptcy Law > ... > Automatic Stay ▼ > Scope of Stay ▼ > Claims Against Estate **Property** ▼

**HN8** ⬇ **Scope of Stay, Claims Against Estate Property**
11 U.S.C.S. § 362(a)(3), which prohibits acts to take possession or exercise control, protects only **property** of the estate. 🔍 More like this Headnote

*Shepardize - Narrow by this Headnote*

Bankruptcy Law > ... > Automatic Stay ▾ > Scope of Stay ▾ > Claims Against Estate Property ▾

### HN9. Scope of Stay, Claims Against Estate Property

11 U.S.C.S. § 362(a) does not prevent a creditor from exercising control over property of the **debtor**, unless it is **in** furtherance of a lien securing a pre-petition debt (prohibited by § 362(a)(5)) or **in** an attempt to collect a pre-petition debt (prohibited by § 362(a)(6)). More like this Headnote

*Shepardize* - Narrow by this Headnote

Bankruptcy Law > ... > Automatic Stay ▾ > Scope of Stay ▾ > Setoffs ▾

### HN10. Scope of Stay, Setoffs

11 U.S.C.S. § 362(a)(7) prohibits the setoff of any debt owing to the **debtor** that arose before the commencement of the case under this title against any claim against the **debtor**. Most of the provisions of § 362(a) apply to actions taken with respect to pre-petition debts. This setoff provision applies to any debt owed by the **debtor**--pre- or post-petition debt. More like this Headnote

*Shepardize* - Narrow by this Headnote

Bankruptcy Law > ... > Automatic Stay ▾ > Violations of Stay ▾ > General Overview ▾

### HN11. Automatic Stay, Violations of Stay

Equitable principles may relieve a court from what is otherwise a mandatory obligation to impose sanctions for stay violations. More like this Headnote

*Shepardize* - Narrow by this Headnote

Civil Procedure > ... > Defenses, Demurrers & Objections ▾ > Affirmative Defenses ▾ > Unclean Hands ▾

### HN12. Affirmative Defenses, Unclean Hands

The unclean hands doctrine should be used only when there is a close nexus between a party's unethical conduct and the transactions on which that party seeks relief. **In** other words, courts may only apply the unclean hands doctrine to prevent a party from using the courts to reap the benefits of its wrongdoing. The doctrine of unclean hands may be raised by the court sua sponte. More like this Headnote

*Shepardize* - Narrow by this Headnote

Bankruptcy Law > ... > Automatic Stay ▾ > Violations of Stay ▾ > General Overview ▾

### HN13. Automatic Stay, Violations of Stay

The equitable exception, used to relieve a court from what is otherwise a mandatory obligation to impose sanctions for stay violation, must be applied very sparingly. There must be compelling equitable considerations which outweigh the **debtor's** need for enforcement of an orderly administration of the **bankruptcy** estate to insure that there is no suffocation of the stay's intended policy. It must not be used simply to relieve a creditor whenever the creditor failed to appreciate that his actions would violate the stay. If it were used **in** such a manner, it would violate the general rule that a stay is "willful" when a creditor has knowledge of the stay and takes an action that violates it, whether or not he appreciates that his action constitutes a violation. This equitable exception should be limited to those situations **in** which the **debtor's** own conduct bears a significant portion of the responsibility for creating the stay violation. The automatic stay was not designed to be used as a kind of spring-loaded gun against creditors who wander into traps baited by the **debtor**. More like this Headnote

*Shepardize* - Narrow by this Headnote

**Counsel:** [...] For Brian Keith Baetz, Jennifer Rebecca Baetz, aka Jennifer Rebecca Chandler, **Debtors:**

Brenda L. B[...], Colorado Springs, CO.

**Trustee:** Robertson B. Cohen, Denver, CO.

**Judges:** Elizabeth E. Brown, **Bankruptcy** Judge.

**Opinion by:** Elizabeth E. Brown

Opinion

**[*231]** ORDER ON DEBTORS' REQUEST FOR DAMAGES ATTRIBUTABLE TO LANDLORD'S ALLEGED STAY

VIOLATIONS

THIS MATTER came before the Court on the **Debtors'** March 6, 2012 letter, alleging violations of the automatic stay against their former **landlord**, Brookside **Properties**, LLC ("Brookside"), the owner of Brookside, Scott Schwartz ("Schwartz"), and its **property** manager, Margarita Ronquillo ("Ronquillo"). The **Debtors** complain of numerous actions taken by the **landlord** following their **bankruptcy** filing, including demand notices for payment, eviction proceedings, removal and sequestration of their possessions, and setoff of their **security deposit**. The whole story, however, reveals that the **Debtors** played a significant role in encouraging the **landlord** to take these actions. This case requires the Court to first consider the scope and duration of the automatic stay in regard to each type of alleged violation. Then the Court must consider the extent to which equitable considerations may bar **[**2]** a **debtor's** recovery of what are otherwise mandatory sanctions imposed by 11 U.S.C. § 362(k) for stay violations.

**I. FACTUAL BACKGROUND**

**In** May, 2011, the **Debtors** leased an apartment from Brookside, with a lease term ending on June 30, 2012. From the beginning, they were **behind** in their **rent** and **deposit** obligations. **In** fact, they, or at least Mr. Baetz, had a history of not paying **rent** as their schedules list debts attributable to other **landlords**.

As early as October 2011, the **Debtors** were contemplating **filing a chapter 7 bankruptcy**. They informed their **landlord** of their plans, but promised that they would not list Brookside as a creditor. **In** a letter dated October 11, 2011, the **Debtors** stated:

> We agree that Brookside **Properties** or any of its agents will not be included in our pending **chapter 7** bankrupsy [sic]. A seperate [sic] agreement will be prepared and signed by us when completed by representative preparing our bankrupsy [sic]. It is understood that this will stop current eviction proceedings. [sic] but will not stop future proceedings should we not **keep** payment arrangements.

The letter set forth a detailed payment arrangement to cure their arrears. They made these promises in order

**[**3]** to induce Brookside to stop a pending eviction action.

On January 12, 2012, the **Debtors** finally **filed** their **chapter 7** petition. They intentionally left Brookside off the list of creditors. Unaware of the **bankruptcy** filing, that same day, Brookside served the **Debtors** with a Demand for Compliance or Right to Possession Notice (an "Eviction Notice"), demanding payment of $1,690.50, which Schwartz and Ronquillo testified credibly that Mrs. Baetz had represented the amount of pre-petition **rent** due. Both Schwartz and Ronquillo testified credibly that Mrs. Baetz had requested this Eviction Notice so that **[*232]** the **Debtors** could present it to various local churches to aid in their solicitation of donations.

Apparently, the donations were not forthcoming or were not used toward the **rent** arrears because the **Debtors** missed their scheduled January 13, 2012 payment. They did pay the scheduled January 27, 2012 payment, even managing to pay it a few days early, which brought the balance of their pre-petition arrears to $1,390.50. As to the missed payment, the **Debtors** reassured Schwartz that they would be able to fulfill their arrangement once they obtained their tax refund in early 2012.

The Debtors attended their creditors' meeting on February 7, 2012. At the meeting,  [**4] they learned that they had to turn over the tax refund to the trustee and, therefore, they could not use it to retire their debt to Brookside. On February 23, 2012, they amended their schedules to include Brookside in the list of creditors. They attempted to give copies of the amendments to Ronquillo this same day, but she refused to accept them. She left them a letter later that evening stating, "I believe that I am not the right person to deliver such as [sic] information And [sic] I believe that he does not deserve it either. I asked him several times to help you and do not evict you [sic]." Undeterred, the Debtors delivered copies to Schwartz on February 24, 2012. Schwartz consulted with an attorney who advised him that, while he could not attempt to collect the pre-petition rent, he could nevertheless proceed with eviction for any post-petition rent past due. Later that evening, Schwartz, Ronquillo, and the Debtors met. The Debtors offered a $100 payment. Ronquillo handed the Debtors an amended Eviction Notice, giving credit for this $100, and listing the remaining balance of post-petition rent outstanding.

Over the course of the next two weeks, the Debtors made additional promises  [**5] and partial payments. On February 27, 2012, the Debtors signed a promissory note purporting to reaffirm their pre-petition obligations. They did not present this informal reaffirmation agreement for approval by the bankruptcy court. On February 29, 2012, they paid an additional $600. After receipt of this payment, Brookside presented the Debtors with an updated Eviction Notice, reflecting the balance owed for post-petition rent. On March 6, 2012, the Court received the Debtors' letter alleging a violation of the automatic stay. Contrary to this position, a day or two later, they signed a stipulation with Brookside, agreeing to a new repayment arrangement in order to stop the pending eviction action. They filed the stipulation with the county court. Predictably, they failed to make the scheduled March 9, 2012 payment. On March 20, 2012, Brookside requested the entry of judgment in the eviction action and the court summarily granted it. The next day the Debtors asked the county court to vacate its judgment, informing the court for the first time of their bankruptcy filing. The court promptly vacated its Order on March 29, 2012.

Before the court vacated its Order, the Debtors gave Schwartz  [**6] a note on March 26, 2012, stating, "We will be back tomorrow evening after work to finish our move out and clean up. We should be out by 9 pm tomorrow night." A neighbor in the apartment complex, Theresa Abbott, testified that the Debtors gave her a set of keys to the apartment and mailbox on March 27, 2012 and set a time to retrieve them from her the following day so that they could complete their move. They did not return the following day. They left behind in their apartment some of their furniture, plants, dirty dishes, and pots and pans.

[*233]  On April 1, 2012, Schwartz entered the apartment and sprayed for ants. Schwartz testified that he, Ronquillo, and Robert Peterson then spent two days cleaning up the Debtors' mess. During cleanup, they disposed of the dishes, pots, and pans. Peterson testified that the dishes might have been salvageable, but the pots and pans were not. They moved most of the remaining personal property into storage, but Ronquillo kept in her apartment the plants, an entertainment center, and the Debtors' loveseat and couch. On April 24, 2012, Brookside sent a Notice of Security Deposit Withholding. The Notice included pre-petition rent. Schwartz testified it was  [**7] his understanding that he was required by law to include everything in this notice, but that he was not attempting to collect the pre-petition rent.

The Debtors did not return to retrieve their personal property until June 20, 2012. On this day, Mrs. Baetz rang the bell for Ronquillo, who appeared briefly at the window, but would not open the door. On July 2, 2012, the Debtors came back again. This time Schwartz met with them, but would not allow them to retrieve their property until they returned their keys. The Debtors eventually agreed to turn over a receipt acknowledging the return of their stored property. The Debtors left without their property. Afterwards the parties agreed, through counsel, that Brookside would deliver the personal property to the residence of a friend of the Debtors on July 23, 2012, at 6:00 p.m.

On this day, Schwartz and two of his helpers delivered the property early, around 4:45 p.m. and they left it at the curb. The residence belonged to Lisa Moss. Her mother, Kathy Gardner, was present when Schwartz began unloading the property. She immediately called her daughter.  [**8] Moss talked with Schwartz by phone, demanding that the property be placed on the driveway and not by the curb. Schwartz insisted that Ms. Gardner sign a receipt for the property before he would agree to move it again. She signed the receipt, Schwartz moved the property, and then he left. Two days later, he returned to Moss's house to retrieve a mattress that did not belong to the Debtors. The Debtors requested its removal because they were worried it might contain bed bugs, but they gave no indication that it infested any of their property or that they suffered any damages attributable to this mattress.

## II. DISCUSSION

### A. General Principles

HN1  The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy. i . .

HN2  Among other things, the stay prevents a creditor from taking any action to collect a prepetition debt or to enforce its lien rights, including the following provisions that  [**9] are implicated by the facts of this case:

(1) the commencement or continuation, . . . of a judicial, administrative, or other action or proceeding against the debtor . . . to recover a claim against the **debtor**

[*234] . . .

(3) any act to obtain possession of **property** of the estate or of **property** from the estate or to exercise control over **property** of the estate;

. . .

(6) any act to collect, assess, or recover a claim against the **debtor** that arose before the commencement of the case . . .;

(7) the setoff of any debt owing to the **debtor** that arose before the commencement of the case under this title against any claim against the **debtor**; . . . . 2⃝

Under this statutory framework, *HN3⃝* once a **debtor** informs his creditors of his **bankruptcy filing**, he is not required to do anything else. The automatic stay operates as its name states-- "automatically." This breathing spell, however, is only a temporary measure. Just as it springs into being automatically, it also terminates automatically following certain events. Those provisions of § 362(a) that protect **property** of the [**10] estate lapse once the **property** is no longer **property** of the estate. 3⃝ All other provisions remain in effect only until the *earlier* of dismissal, case closing, or the entry of a discharge order **in the case of an individual chapter 7 debtor** (and certain other **debtors**). 4⃝ At the conclusion of the typical **chapter 7** case, the automatic stay is replaced by the discharge injunction set forth **in** § 524. The discharge injunction eliminates the **debtor's** personal liability for the pre-petition debt owed to the creditor (unless it is a non-dischargeable debt), but it does not eliminate any lien rights that may exist.

*HN4⃝* **In** order to impose sanctions against a creditor for violating the stay, the Court must first find the creditor's actions were "willful." 5⃝ **In** order for a violation to be "willful," evidence of specific intent to violate the stay is not required. Violations are "willful" if the party knew of the automatic stay and intended to take the actions that violated the stay. A party's good faith belief that it has a right to the **property** at issue is not relevant to a determination of whether the act was "willful" [**11] or whether compensation must be awarded. 6⃝ Even an innocent stay violation (one committed without knowledge of the stay) becomes willful, if the creditor fails to remedy the violation after receiving notice of the stay. 7⃝ **In** effect, the term "willful" refers to the deliberateness of the conduct, coupled with knowledge of the **filing**. It does not require an intent to violate a court order. Once a court finds a violation of the stay to be willful, § 362(k) ordinarily makes the award of damages for injuries mandatory. 8⃝

## B. Analysis of Potential Stay [**12] Violations

Applying these general principles, the Court first notes that the relevant time [*235] period for determining the respondents' liability begins on February 23, 2012, the date on which the **Debtors** first informed Brookside and its agents of the **bankruptcy filing**. When the stay terminated differs depending on whether the actions complained of involved **property** of the estate or not and at what stage **in** the **bankruptcy** proceedings they occurred. The Court must also explore the scope of the automatic stay, which, while undeniably broad, does have some outer limits

## 1. Attempts to Collect Rent

From the time Brookside learned of the **bankruptcy filing** until the end of March, the parties went back and forth between the **Debtors** offering various repayment proposals and the **landlord** pursing an eviction. Clearly, *HN5⃝* the automatic stay prevents creditors from acting to collect a debt or to commence or continue legal proceedings. 9⃝ The language of § 362(a), however, prohibits only proceedings and collection activity that attempts to collect a *pre-petition* debt. After Brookside consulted its attorney on or about February 24, 2012, it attempted only to collect *post-petition* **rent**. It was the **Debtors** who offered [**13] payment plans to their **landlord** that included both pre- and post-petition debt. At trial, the parties disputed whether the post-petition payments were intended to be applied toward pre-petition debt, but with each post-petition payment, the **landlord** provided an updated Eviction Notice, reflecting only the remaining post-petition balance. Thus, neither the negotiations, the stipulations, nor the Eviction Notices constituted stay violations.

## 2. Eviction Proceedings

The act to evict the **Debtors** from the apartment, however, may constitute a technical violation of the stay. The **Debtors'** interest in this residential lease became **property** of their estate. Their **bankruptcy** trustee had sixty

days, or until approximately March 12, 2012, in which to assume it, failing which it would be deemed rejected. 10 ‡. Not surprisingly, the trustee did not take any action to assume it. "HN8 ⌃ [I]n virtually every Chapter 7 no-asset case the trustee realizes no benefit from assuming the debtor's residential lease, and thus in virtually every Chapter 7 no-asset case, the residential lease is deemed rejected . . . ." 11 ‡.

"Rejection," however, is not synonymous with termination of the lease. Admittedly, this leasehold interest had inconsequential value to the estate. But was it nevertheless still a property interest of the estate and, therefore, protected by the automatic stay? There are several provisions in the Bankruptcy Code that either cause the trustee to surrender the leased property upon rejection or that provide explicitly that it is no longer property of the estate, but these provisions apply only to non-residential real property and personal property leases. 12 ‡. HN7 ⌃ The rule of statutory construction known as expressio unius est exclusio alterius, provides that when the "persons and things to which [a [*236] statute] refers are designated, there is an inference that all omissions should be understood as exclusions." 13 ‡. Arguably then, Congress' omission of residential leases means that they remain property of the estate despite their rejection, until either formal abandonment, case closing, or entry of an order granting stay relief. 14 ‡.

On the other hand, two circuit courts have noted, without substantial analysis, that the rejection of a residential real property lease constitutes an abandonment and, therefore, the property is no longer property of the estate. 15 ‡. Technically, mere rejection does not satisfy the requirements of § 554, which governs abandonment of property of the estate. Although there may be grounds to seek abandonment when property of the estate is of inconsequential value and benefit to the estate, § 554(a) requires "notice and a hearing" before abandonment may occur based on its inconsequential value.

These circuit court decisions, however, provide a much needed practical result. If there is nothing left for the estate to do with a residential lease following its rejection, there does not appear to be any good reason to require landlords to seek stay relief remedies. Perhaps the omission of residential leases from these Code sections that explicitly provide for surrender and "non-property of the estate" status reflects nothing more than superior lobbying efforts of commercial lessors, rather than a conscious choice to exclude residential leases. Nevertheless, the Tenth Circuit has yet to weigh in on this issue. For this reason, landlords in this district would be well advised to seek stay relief if they seek to terminate a lease and evict the debtor before the termination of the automatic stay, even if they are seeking to do so only on the basis of past due post-petition rent. An ounce of prevention is worth a pound of cure. [**17] A lesson no doubt well learned by Brookside at this point.

## 3. Removal and Storage of the Debtors' Possessions

In this case, the landlord took possession of the Debtors' belongings on April 1, 2012 when it moved them into storage and it retained possession until July 23, 2012, when it delivered them in accordance with the Debtors' instructions. The Debtors have complained that the landlord's removal and sequestration of their possessions constituted acts to obtain possession or exercise control over property of the estate. First, the language of HN8 ⌃ § 362(a)(3), which prohibits acts to take possession or exercise control, protects only "property of the estate." The Debtors' possessions ceased to be property of the estate by March 7, 2012. All of their possessions were claimed as exempt property in their schedules. The Debtors' creditors' meeting concluded on February 7, 2012, and no one objected to any of their claimed exemptions within 30 days following the conclusion of the creditors' meeting, as required by Fed. R. Bankr. Proc. Rule 4003(b)(1). Thus, by March 7, 2012, the Debtors' exemptions had ripened. As a result, their possessions reverted to their pre-bankruptcy status as property [**18] of the debtor. HN8 ⌃ Section 362(a) does not prevent a [*237] creditor from exercising control over property of the debtor, unless it is in furtherance of a lien securing a pre-petition debt (prohibited by § 362(a)(5)) or in an attempt to collect a pre-petition debt (prohibited by § 362(a)(6)).

In reality, the Debtors abandoned these possessions when they vacated the apartment on March 26, 2012. They did not return to reclaim them until June 20, 2012, almost three months later. Did they expect their landlord to keep the apartment unoccupied indefinitely? Or to store their possessions for free indefinitely? Or would they have preferred that it put them out by the curb, where anyone could take them? What the Debtors complain of most is not the fact that the landlord moved their possessions out of the apartment, but that the landlord frustrated their attempts to reclaim them in June and July. At this point in time, these possessions were no longer under the umbrella protection of the automatic stay. The discharge injunction had replaced the stay and, thus, still prevented any attempt to collect pre-petition debts, but the landlord did not withhold the possessions in order to extract payment of pre-petition [**19] debt. Schwartz demanded the return of the Debtors' keys and a signature acknowledging their receipt of the goods. Undoubtedly, he wanted to know that he was "done" with these Debtors, as they would no longer have access to the apartment building and could not make a claim that he had failed to return their possessions.

## 4. Offset of Security Deposit

The only remaining matter is the Notice of Security Deposit Withholding. On April 24, 2012, the landlord informed the Debtors of its intention to offset the Debtors' deposit against their outstanding pre- and post-petition rent

obligations. Schwartz testified that he did not intend to use the offset against pre-petition debt, but thought he was obligated to list all defaults in order to satisfy state law. Even if he had only listed post-petition debt, he would nevertheless have run afoul of the automatic stay. As previously mentioned, *HN10* § 362(a)(7) prohibits "the setoff of any debt owing to the **debtor** that arose before the commencement of the case under this title against *any* claim against the **debtor** . . . ." (emphasis added). Most of the provisions of § 362(a) apply to actions taken with respect to pre-petition debts. Curiously, this setoff this provision applies to *any* debt owed by the **debtor** -- pre- or post-petition debt. Thus, for as long as the automatic stay remained in existence, it prohibited Brookside from offsetting its pre-petition obligation to return the **deposit** against any debt owed by the Debtors, even against their post-petition **rent** obligations.

The **Debtors** claimed the **deposit** as exempt **property** on their Schedule C. They did so on the basis of a homestead exemption, which clearly does not apply to a **rent deposit**. But neither the trustee nor any other party in interest objected to its exemption before the deadline for objections and, therefore, this exemption ripened. Consequently, the **deposit** was no longer **property** of the estate as of March 7, 2012. As with the possessions discussed above, the **deposit** then reverted to its pre-**bankruptcy** status as **property** of the **debtor**. As such, it continued to enjoy the protection of the automatic stay until the **Debtors** obtained their discharge on May 17, 2012. Thus, the April setoff violated the automatic stay.


## C. Application of Equitable Principles

From a cold reading of the facts of this case, it may appear that the **landlord** and its agents violated the stay with no care or [**21] heed of the consequences. [*238] What became clear to the Court from listening to the testimony, however, was that the **Debtors** in this case orchestrated a scheme to dupe the **landlord**. They were the ones to reassure the **landlord** that its debt would not be covered by the **bankruptcy** filing. Once they changed their mind, after learning they could not use the tax refund to pay some of the past due **rent**, and after having run up a significant post-petition **rent** obligation, they amended their schedules to include the **landlord** and informed it of this change. The **landlord** immediately consulted with counsel and from that point forward took no steps to collect anything other than post-petition **rent**. But every time the **landlord** got close to an eviction based on the post-petition **rent**, the **Debtors** were the ones to offer a new payment plan. They were the ones to include pre-petition **rent** in the stipulations. With all of the back and forth between these parties from February 23 to March 6, the **Debtors** never once made mention of their right to the protection of the automatic stay. After **filing** the March 6, 2012 letter with the Court alleging stay violations, they still continued to approach the **landlord** with [**22] informal agreements to reaffirm the debt. On the basis of observing the demeanor of the witnesses, the Court formed the impression of dishonest **debtors** who misled the **landlord** and its agents, and who were attempting to play games with the **bankruptcy** process.

The Tenth Circuit has recognized a narrow exception for circumstances in which it would be inequitable to impose liability for a stay violation. In *Calder v. Calder*, 16 the **debtor** actively litigated in a state court action after his Chapter 13 **filing** and did not provide notice of his **bankruptcy** until just before the state court was about to enter final judgment. The Tenth Circuit affirmed the **bankruptcy** court's allowance of the creditor's claim established by the post-petition state court judgment, despite the fact it had entered in violation of the stay.

> To hold otherwise and permit the automatic stay provision to be used as a trump card played after an unfavorable result was reached in state court, would be inconsistent with the underlying purpose of the automatic stay which is to give a **debtor** a "'breathing spell from his creditors.'" 17

Other courts agree that *HN11* equitable principles may relieve a court from what is otherwise a mandatory [**23] obligation to impose sanctions for stay violations. 18

> *Calder's* ruling is not limited to its particular facts.

> *Calder* stated that equitable principles could be applied "at least where the creditor was without actual knowledge of the **bankruptcy** and the bankrupt's unreasonable behavior contributed to the **debtor's** plight." Similarly, the Tenth Circuit **Bankruptcy** Appellate Panel did not narrow the *Calder* holding when explaining that "[c]ircumstances that trigger equitable considerations" merely "*include*" those outlined in *Calder*. Indeed, the Tenth Circuit in *Calder* favorably cited cases that exceeded its own [*239] limited facts. 19

Relying on equitable principles in this context is akin to applying the doctrine of [**24] "unclean hands." *HN12* This doctrine should be used only when there is a close nexus between a party's unethical conduct and the transactions on which that party seeks relief. 20 In other words, courts may only apply "the unclean hands doctrine to prevent a party from using the courts to reap the benefits of [its] wrongdoing." 21 The doctrine of unclean hands may be raised by the Court *sua sponte*. 22

The Court recognizes that *HN13* this equitable exception must be applied very sparingly. "[T]here must be compelling equitable considerations which outweigh the court's need for enforcement of an orderly administration of the **bankruptcy** estate . . . to insure that there is no suffocation of the stay's intended policy." 23 It must not be used simply to relieve a creditor whenever the creditor failed to appreciate that his actions would violate the stay. If it were used in such a manner, it would violate the general rule that a stay is "willful" when a creditor has knowledge

[**25]** of the stay and takes an action that violates it, whether or not he appreciates that his action constitutes a violation.

This equitable exception should be limited to those situations in which the **debtor's** own conduct bears a significant portion of the responsibility for creating the stay violation. It is the firm conviction of this Court that the technical violations committed by Brookside and its agents were in large part caused by the **Debtors'** statements and actions lulling them into a false sense of security. "The automatic stay was not designed to be used as a kind of spring-loaded gun against creditors who wander into traps baited by the **debtor**." *Id.*

## III. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the **Debtors'** request for the imposition of sanctions against the respondents is hereby DENIED.

Dated this 21st day of February, 2013.

BY THE COURT:

/s/ Elizabeth E. Brown ▾

Elizabeth E. Brown ▾, **Bankruptcy** Judge



**Footnotes**

1 ⭑
H.R. Rep. No. 95-595, at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296-97, 1977 WL 9628 (capitalization altered).

2 ⭑
11 U.S.C. § 362(a).

3 ⭑
11 U.S.C. § 362(c)(1).

4 ⭑
11 U.S.C. § 362(c)(2).

5 ⭑
11 U.S.C. § 362(k).

6 ⭑
*In re Diviney*, 225 B.R. 762, 774 (10th Cir. BAP 1998). *See also, Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 227 (9th Cir. 1989); *In re Crysen/Montenay Energy Co.*, 902 F.2d 1098, 1104-05 (2d Cir. 1990); *Budget Serv. Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289, 293 (4th Cir. 1986).

*In re A & J, 225 B.R. at 54; Pearl ... s Better Home ... 1 B.R. 955, 967 (N.D. Ill. 1992); In re ... 121 ... 155, 5 ... (1st Cir. BAP 1997).*

8 ¶
*In re Mulkey*, 81 B.R. 280, 284 (Bankr. D.N.J. 1987); *Tel-4-Communications v. Joann's Bar House* (blurred text), 98 B.R. 250, 255 (Bankr. (blurred))

9 ¶
11 U.S.C. § 362(a)(1) & (6).

10 ¶
11 U.S.C. § 365(d)(1).

11 ¶
*In re Stoltz*, 315 F.3d 80, 85 n.1 (2nd Cir. 2002)(*quoting* [**14] *In re Sheard*, 1999 Bankr. LEXIS 811, 1999 WL 454260 at *3 (Bankr. E.D. Pa. June 24, 1999)).

12 ¶
For non-residential real **property** lease provisions, *see, e.g.*, 11 U.S.C. § § 541(b)(2), 362(b)(10), 365(d)(4). [**15] For personal **property** leases, *see* 11 U.S.C. § 365(p)(1)("If a lease of *personal property* is rejected or not timely assumed by the trustee . . . the leased **property** is no longer **property** of the estate and the stay under section 362(a) is automatically terminated.")(emphasis added).

13 ¶
2A Norman J Singer & J.D. Shambie Singer, <u>Sutherland Statutes and Statutory Construction</u> § 47:23 (7th ed. 2007).

14 ¶
11 U.S.C. §§ 362(c)(1), 554.

15 ¶
*In re Stoltz*, 315 F.3d at 85, n. 1; *In re Biggs*, 271 Fed. Appx. 286, 288, 2008 WL 858978, *2 (3d Cir. 2008)(not selected for publication)(relying only on *In re Stoltz* for this proposition); [**16] *In re Rodall*, 165 B.R. 506 (Bankr. M.D. Fla. 1994); *In re Reed*, 94 B.R. 48 (E.D. Penn. 1988). *But see In re Thompson-Mendez*, 321 B.R. 814 (Bankr. D. Md. 2005)(deemed rejected residential lease not considered abandoned and, therefore, stay relief was required).

16 ¶
*Calder v. Calder*, 907 F.2d 953 (10th Cir. 1990).

17 ¶
*Id.* at 956-57 (citations omitted).

18 ¶    *See, e.g.,* Onyx Invs., L.L.C. v. Foster, 2007 U.S. Dist. LEXIS 34165, 2007 WL 1347696 (D. Kan. 2007);

19 ¶    *Onyx Invs., L.L.C.,* 2007 U.S. Dist. LEXIS 34165, 2007 WL 1347696, *8 (citations omitted).

20 ¶    *In re Uwimana,* 274 F.3d 806, 810 (4th Cir. 2001)(*citing Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 78 L. Ed. 293; 1934 Dec. Comm'r Pat. 639 (1933)).

21 ¶    *Id.* at 811.

22 ¶    *In re Rawles,* 2009 **Bankr.** LEXIS 2988, 2009 WL 2924005, *3 (Bankr. D. Md. 2009)(citations omitted).

23 ¶    *In re Cinematronics,* 111 B.R. at 901.

24 ¶    *In re Clayton,* 235 B.R. at 807.

**Content Type:** Cases

**Terms:** The debtor files for chapter 7 bankruptcy in new jersey and is behind on his rent. Can the landlord then keep the security deposit or is it the debtor's property?

**Narrow By:** -None-

**Date and Time:** Sep 24, 2019   02:45:24 p.m. EDT